UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Lisa Cristia, individually and on behalf of all others similarly situated, | 1:22-cv-01788 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Trader Joe's Company, | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Trader Joe's Company ("Defendant") manufactures, labels, markets, and sells juice represented as "Cold Pressed" under its Trader Joe's brand ("Product").



2. The relevant front label representations include "Cold Pressed Juice," the type or flavor, i.e., "Green," "Perishable, Keep Refrigerated" and "Trader Joe's."

3. Consumers are familiar with the term "fresh squeezed juice" and understand this refers to juice that is unprocessed, in its raw state and not subjected to any form of thermal or other form of preservation.

4. "Fresh squeezed juice" typically refers to citrus juices because these are extracted from citrus fruits by squeezing.

5. In contrast, juice from non-citrus fruits is obtained through the application of physical pressure to extract the liquids.

6. The term, "cold press," refers to various pressing methods such as the Rack and Frame Hydraulic Press, Horizontal Piston Press, Bladder Press, Belt Press, and Screw Press.

7. These methods do not involve the introduction of cold temperatures.

8. The word, "cold," is used to distinguish juices made through being pressed as opposed to being made from a centrifugal juice machine, similar to a blender.

9. Many consumers believe that juice made through a centrifugal machine causes an increase in temperature, which does not occur when juice is made through a pressing method.

10. Like "fresh squeezed juice," consumers understand "cold pressed juice" refers to juice which was extracted from fruits and vegetables and not processed or subjected to any form of preservation beyond being "squeezed" or "pressed."

11. Defendant sells the Product in the produce section of its stores, in proximity to fresh fruit and vegetable products, which gives consumers the impression it is freshly made, and reinforces the statement of "cold pressed juice."



12. However, the Product has more in common with juices sold in standard refrigerator cases, because it is not freshly made or only cold pressed.



3

13. This is disclosed through the fine print on the side of the Product, which states:

> We source fresh vegetables and fruits and extract the juices through a hydraulic press. We then use a cold water pressure method called HPP (high pressure processing) to maintain the safety of the juice and the quality of flavor.



14. "High pressure processing" or "HPP" is applied to the juice after it is extracted from the fruits and vegetables.

15. The use of HPP means describing the juice as "cold pressed" is misleading because it was processed after being extracted.

16. Other juice products sold by Defendant inform customers of subsequent processing steps they are subjected to.

17. For instance, the front labels of Defendant's apple juice is described as made from "100% Freshly Pressed Apples," but also prominently informs consumers it is "Flash Pasteurized," while its orange juice states, "Pasteurized."

 

18. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

19. Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

20. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

21. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

22. Had Plaintiff and proposed class members known the truth, they would not have

5

bought the Product or would have paid less for it.

23. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $3.39 per 15.2 OZ, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

24. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

25. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

26. Plaintiff Lisa Cristia is a citizen of Illinois.

27. Defendant Trader Joe's Company is a California corporation with a principal place of business in Monrovia, Los Angeles County, California.

28. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

29. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, with the representations described here, in thousands of locations, in the states covered by Plaintiff's proposed classes.

30. The Product is available to consumers from Defendant's retail stores and its website.

31. Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to these claims occurred in Cook County, including Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

32. Plaintiff Lisa Cristia is a citizen of Chicago, Cook, Illinois.

33. Defendant Trader Joe's Company is a California corporation with a principal place of business in Monrovia, California, Los Angeles County.

34. Trader Joe's is an American chain of grocery stores with 530 stores nationwide.

35. Trader Joe's is the most profitable grocery store per square foot in the country.

36. Trader Joe's is a retailer that expresses its concern for the environment and labor practices.

37. In 2007, reacting to customer concerns, Trader Joe's began to eliminate foods imported from China.

38. Trader Joe's has been recognized by Greenpeace's CATO ("Carting Away the Oceans") program by removing unsustainable species of fish from its shelves.

39. Trader Joe's discontinues individual products based on customer reactions more often than larger grocery chains.

40. All these facts show a retailer with a significant amount of trust and equity when it comes to consumer purchasing.

41. While a typical grocery store may carry 50,000 items, Trader Joe's stocks about 4,000 items, 80% of which bear one of its brand names.

42. Trader Joe's sells regular groceries, but also gourmet foods, organic foods, vegetarian foods, unusual frozen foods, imported foods, and domestic and imported wine and beer.

43. While Trader Joe's stores sell leading national brands, they sell a large number of products under one of their private label brands, Trader Joe's.

44. Private label products are made by third-party manufacturers and sold under the

name of the retailer, or its sub-brands.

45. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

46. Products under the Trader Joe's brand have an industry-wide reputation for quality and value.

47. In releasing products under the Trader Joe's brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

48. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

49. That Trader Joe's branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

50. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

51. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

52. Private label products under the Trader Joe's brand benefit by their association with consumers' appreciation for the Trader Joe's brand as a whole.

53. The development of private label items is a growth area for Trader Joe's, as they select only top suppliers to develop and produce Trader Joe's products.

54. Consumers trust the Trader Joe's brand to be honest with them, because it has built up a reservoir of good will based on its practices and quality.

55. The Product is available to consumers from Defendant's retail stores and its website.

56. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Trader Joe's, 190 N Northwest Hwy Park Ridge IL 60068-3342 between March 19, 2021, and August 19, 2021, and/or among other times.

57. Plaintiff believed and expected the Product was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed because that is what the representations and omissions said and implied.

58. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

59. Plaintiff bought the Product at or exceeding the above-referenced price.

60. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

61. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

62. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

63. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or

composition.

64. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar fruit juice products which were not highly processed, because she is unsure whether those representations are truthful.

## Class Allegations

65. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Arkansas, Iowa, Wyoming, Texas, Nebraska, South Dakota, West Virginia, Utah, Idaho, Alaska, and Montana who purchased the Product during the statutes of limitations for each cause of action alleged.

66. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

67. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

68. Plaintiff is an adequate representative because her interests do not conflict with other members.

69. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

70. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

71. Plaintiff's counsel is competent and experienced in complex class action litigation

and intends to protect class members' interests adequately and fairly.

72. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

73. Plaintiff incorporates by reference all preceding paragraphs.

74. Plaintiff believed the Product was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed.

75. Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

76. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

77. Plaintiff relied on the representations and omissions to believe the Product was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed.

78. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

79. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

80. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

81. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

82. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

83. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

84. The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed.

85. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

86. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

87. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed.

88. Defendant's representations affirmed and promised that the Product was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed.

89. Defendant described the Product so Plaintiff and consumers believed it was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed, which became part of the basis of the bargain that it would conform to its affirmations and promises.

90. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

91. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high quality products.

92. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

93. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

94. Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

95. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

96. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

97. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the

promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed.

98. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

99. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

100. Defendant had a duty to truthfully represent the Product, which it breached.

101. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company known for its high quality products.

102. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

103. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

104. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

105. Plaintiff and class members reasonably and justifiably relied on these negligent

misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

106. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Fraud

107. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was not processed after being cold pressed, based on the front label, its placement within the store, and prominent statements on similar products which disclosed how they were processed.

108. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

109. Defendant knew of the issues described here yet did not address them.

110. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

## Unjust Enrichment

111. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the

     challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: April 7, 2022

                                          Respectfully submitted,

                                          /s/Spencer Sheehan
                                          Sheehan & Associates, P.C.
                                          Spencer Sheehan
                                          60 Cuttermill Rd Ste 412
                                          Great Neck NY 11021
                                          Tel: (516) 268-7080
                                          spencer@spencersheehan.com